BOYD BROTHERS, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Paul Oxford, Appellee).

Fifth District (Industrial Commission Division)   No. 5—93—0656WC

Opinion filed June 16, 1994.

Michael F. Dahlen and Gary B. Nelson, both of Feirich/Schoen/Mager/Green, of Carbondale, for appellant.

Serkland & Muelhausen, of Chicago (James C. Serkland, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Paul Oxford, filed an application for adjustment of claim, pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*). Therein he alleged brain injuries arising out of and in the course of his employment with Boyd Brothers, Inc. (the employer). After a hearing, the arbitrator entered a decision which found that claimant was permanently and totally disabled and that he was entitled to $15^1/7$ weeks of temporary disability and $9,069.22 for necessary and reasonable medical expenses. The Industrial Commission (Commission) adopted and affirmed the arbitrator's decision, and the circuit court confirmed the Commission's decision. This timely appeal followed.

The employer raises three issues, namely, (1) the Commission erred in finding that claimant sustained an injury arising out of and in the course of his employment; (2) the Commission erred in finding that claimant was totally and permanently disabled; and (3) the Commission erred in finding that claimant's medical expenses were causally connected to the subject accident.

At the February 19, 1992, arbitration hearing, the following evidence was adduced. As of the hearing date, claimant was 58 years old with a ninth-grade education. He served in the Army from 1950 to 1953, during which time he earned his GED. Following his discharge, claimant began working as a mechanic and heavy equipment operator. He continued this type of employment until the date of the subject accident, prior to which he had not experienced any significant physical problems.

Claimant testified that on June 14, 1985, he was engaged for several hours in assembling a 350- to 400-pound Caterpillar radiator, which was used in a "dirt scoop." The radiator was suspended on a chain so that claimant could attach side shields, each of which weighed between 100 and 150 pounds. To attach a shield, claimant had to lift it into place and hold it steady with one hand, while using the other hand to attach the bolts, which secured it. As he did this, the radiator tended to rotate toward him, complicating his task. Consequently, claimant used his head to steady the radiator. At one point during his assembly of the radiator, claimant experienced extensive numbness on his left side and also became dazed and befuddled. He told his shop foreman that something was wrong and that he had to go home.

Claimant has little recollection of the following days, during which his left-side numbness and severe headaches persisted. On June 18, 1985, claimant was examined by his family physician, Dr. Andrew Cserny, who referred him to Dr. William Madauss. He was hospitalized by Dr. Madauss at Welborne Hospital in Evansville, Indiana. The record shows that claimant was hospitalized from June 20, to June 23, 1985. Claimant stated that he continued to experience numbness, severe headaches, and memory lapses in the following months.

Dr. Cserny told claimant in early September 1985 that he could return to light work. Claimant stated that in the heavy construction industry there are no such jobs. Claimant attempted to perform some household tasks but found that he would drop things and, on occasion, fall for no apparent reason. He was often disoriented and would forget where he was, even in familiar surroundings.

Claimant attempted to return to work in April 1986. He reported

to his union hall and was sent to work at Superior Structure. Claimant was unable to hold objects with his left hand. On one occasion, a grinder he was operating fell from his grasp and almost cut off one of his toes. On another occasion, he was transporting a battery, which fell from his hands and broke. Further, he attempted to work a backhoe but lacked the coordination to operate it. He was then assigned to a roller (asphalt compactor), which was a simple machine to control. Claimant, nevertheless, lost control of the roller several times, the last being when the roller tipped over on its side. Claimant was not injured but was taken off this job and put to work on a bulldozer. Again, he was unable to operate the machine successfully. After this, claimant was laid off. While returning home after this lay-off, claimant became completely disoriented and was unable to return home without the aid of a friend. Since April 1986, he has not looked for other employment.

Claimant stated that, as of the arbitration hearing date, he continued to have periods of disorientation. He did not drive unless someone went with him. Since 1986, Dr. Warren Tuttle has been his primary physician.

Barbara Oxford, claimant's wife, testified that, prior to the subject accident, claimant's health had been good. She described his problems thusly:

> "[H]e has trouble remembering. He'll try to make a phone call and can't remember the number. He used to be real good at numbers, and he can't remember numbers now. He drops things. He falls. He'll be walking along on flat ground and just all of a sudden, down he goes and he doesn't realize he is going to fall so he doesn't even try to catch himself, and he just generally doesn't do too much. He can't do any lifting if there's any weight to it at all ***[.] [H]e doesn't try to lift anything that could cause any exertion."

Mrs. Oxford further stated that sunlight and noise worsened claimant's headaches.

Dr. William Madauss, a board-certified neurosurgeon, testified via an evidence deposition taken on September 17, 1987. Claimant was referred to him by his family physician, Dr. Andrew Cserny. At the initial examination on June 18, 1985, claimant stated that he had "a spell" on June 14, 1985, while working and that thereafter he had experienced numbness in his left arm and leg and a right-sided headache. These symptoms had persisted for two or three days and then gradually disappeared.

Dr. Madauss' examination revealed mild weakness in claimant's left arm. His gait and reflexes were normal. Dr. Madauss noted some

artherosclerotic changes in the retinal vessels. He thought that claimant's artherosclerotic condition had developed over the years. A CT scan ordered by Dr. Madauss indicated no abnormalities. He opined that, on the subject date, claimant might have suffered a temporary ischemic attack (TIA).

Dr. Madauss regularly saw claimant when he was hospitalized at Welborne Baptist Hospital from June 20, 1985, to June 23, 1985. Tests indicated a degenerative disc disease between C-6 and C-7, causing radiculopathy. Dr. Madauss thought that this condition could explain claimant's complaints of left-side weakness. Blood tests revealed an elevated triglyceride level, which provided support for Dr. Madauss' diagnosis of atherosclerosis. An arteriogram did not reveal any occlusion of the arteries. He did not order any treatment except for prescribed medications to prevent clotting. In Dr. Madauss' view, claimant could have returned to work upon his release from the hospital. He opined that, based on a reasonable degree of medical certainty, claimant's exertion on the subject date had nothing to do with a possible TIA. Dr. Madauss did not see claimant again after the latter was discharged on June 23, 1985, from Welborne Hospital.

Dr. Chester Higdon, a board-certified neurologist, testified via an evidence deposition taken on September 17, 1987. He initially examined claimant on July 15, 1985. Claimant related a history of the subject lifting incident, his hospitalization, and Dr. Madauss' treatment. Claimant further related that, on July 4, 1985, he had developed numbness and drooping of the left side of his mouth. This numbness lasted approximately four hours. Claimant also referred to some discomfort in his left hand, left forearm, and left foot.

On the same date, Dr. Higdon admitted claimant to St. Mary's Hospital in Evansville, Indiana. There claimant underwent a series of tests, one of which indicated that claimant's right pattern inferior cerebellar artery (PICA) was absent. Dr. Higdon opined that this condition could be congenital, the result of hardening of the arteries, or the result of a "blood clot or thrombus blocking it off [leading to] *** a stroke-like event." His diagnosis was vertebral basilar artery insufficiency and vascular headaches. He did not relate this condition to the subject "lifting episode," nor was he "aware of lifting being a risk factor for a stroke," yet Dr. Higdon would not say that such an exertion could never lead to a stroke-like event.

Dr. Warren Tuttle, a general practitioner, testified via an evidence deposition taken on January 15, 1987. He began treating claimant on June 25, 1986. Dr. Tuttle concurred with Dr. Higdon's diagnosis of vertebral basilar artery insufficiency. He also agreed that the absent right PICA could be due to a congenital condition or

to hardening of the arteries. Dr. Tuttle was not asked whether said condition could be the result of a stroke. He concluded that claimant had a "blood vessel disease" prior to the subject incident. In Dr. Tuttle's opinion, the strain of working with heavy equipment was not a primary cause of claimant's condition but could have been a contributing factor to it.

At claimant's request, Dr. Nathaniel Greenberg examined claimant on November 5, 1985. Subsequently, Dr. Greenberg reviewed all pertinent medical documents and testified via an evidence deposition taken on December 7, 1989. He diagnosed a vertebral basilar artery insufficiency, resulting in the occlusion of the right PICA. Dr. Greenberg described the two systems by which the brain receives blood. One is the aortal system, which goes up both sides of the neck into a complex network at the brain's base. The second system consists of vessels which go up the spine and unite at the entrance of the skull to form a single basilar artery. Dr. Greenberg opined that claimant's symptoms were consistent with the closure or occlusion of the right PICA, which is a part of the basilar system.

Dr. Greenberg concurred with Dr. Higdon's view that stress was not a common cause of stroke, but he stated that it was a well-known risk factor that "has been clearly noted for years." He concluded that claimant's heavy physical exertion on June 15, 1985, caused a rise in his blood pressure. Claimant's preexisting artherosclerotic disease made him more vulnerable to a spasm resulting from high blood pressure. Dr. Greenberg opined that such a spasm resulted in the closure of claimant's right PICA and caused his current symptoms. While conceding that vessels can occlude with or without stress, he further described why, in this case, claimant's strenuous work activity caused a stroke.

"We have a circumstance [claimant's lifting] which is recognized to be capable of causing an occlusion of a previously diseased artery, [and] we have risk factors present that would indicate a higher than normal degree of risk for arteriosclerotic [sic] disease. So the conditions were right for the exertion to produce the occlusion. In addition, the occlusion occurred under those conditions and did not occur at any other time, so to say that it was purely a coincidence, I think is stretching the level of coincidence beyond [a] reasonable degree."

Dr. Greenberg did not agree with Dr. Madauss' conclusion that, at most, claimant had suffered a TIA. He stated that such temporary incidents did not result in the type of permanent symptoms that claimant had experienced.

The employer initially argues that the Commission erred in determining that claimant's injury arose out of and in the course of his employment. The employer contends that the only reliable and probative evidence in the instant record overwhelmingly supports the finding that claimant's condition of ill-being did not arise out of his employment. Further, the employer maintains that the occurrence of claimant's symptoms while he was assembling the radiator was a mere coincidence. In response, claimant argues that he met his burden of proving that he had a stroke which was caused at least in part by work-related stress. He asserts that the evidence demonstrates that the subject injury was not the result of mere coincidence.

As we have often stated, it is the Commission's function to judge the credibility of witnesses, to determine the weight to be given to their testimony, and to draw reasonable inferences therefrom. (*Williams v. Industrial Comm'n* (1993), 244 Ill. App. 3d 204, 209.) Where medical opinions differ, the Commission must determine the weight given to those opinions. (*Frigo v. Industrial Comm'n* (1990), 199 Ill. App. 3d 880.) The question of causation is one of fact for the Commission, and its determination will not be disturbed unless the finding is against the manifest weight of the evidence. (*Williams*, 244 Ill. App. 3d at 210.) In order to establish the right to compensation, claimant need not prove that some phase or act of employment was the sole causative factor. (*Brooks v. Industrial Comm'n* (1979), 78 Ill. 2d 150.) He must only prove that his employment was *a* causative factor. (*Brooks*, 78 Ill. 2d at 155.) Further, proof of good health prior to an injury and a subsequent condition of ill-being creates an issue of fact as to the causal connection between the injury and the condition of ill-being. *A.O. Smith Corp. v. Industrial Comm'n* (1977), 69 Ill. 2d 240, 245.

■ Admittedly, the medical testimony conflicts as to the cause of claimant's condition of ill-being. We do not find the employer's reliance on Dr. Madauss' testimony particularly compelling. Given the permanence of claimant's condition, his diagnosis of a possible TIA makes little sense. Nor was he aware of the closing of claimant's right PICA, which also lessens the significance of his opinion. Accordingly, this testimony carries little weight.

Further, while Dr. Higdon doubted a relationship between physical stress and a stroke, he admitted that an occluded PICA could be: (1) congenital, (2) the result of hardening of the arteries, or (3) an acute event, *e.g.*, a blood clot or thrombus that blocked the PICA. Dr. Higdon testified that he is "not aware of lifting being a risk factor for a stroke." Nevertheless, he was unwilling to rule out lifting as a cause of claimant's condition of ill-being.

The probative value of Dr. Tuttle's testimony is also greatly diminished by his vacillating in regard to causation. At one point in his testimony, he stated:

"I think the patient had to have blood vessel disease prior. I think the fact that he had blood vessel disease of—because sudden strain causing increased internal pressure that might be a contributing factor for him to have a vascular episode such as he had, but I can't say—I don't think it is the primary cause, but I think it would be a contributing factor."

At another point in his testimony, Dr. Tuttle appears to reverse himself, indicating that the stress of claimant's lifting heavy parts of a radiator was not a contributing factor to claimant's condition of ill-being. Given this contradictory testimony, Dr. Tuttle's testimony can be given little emphasis.

Finally, it is apparent that Dr. Greenberg's testimony provided primary support for the Commission's finding of a causal connection. Dr. Greenberg determined that claimant's strenuous physical exertion caused a rise in his blood pressure. In his opinion, this factor, coupled with claimant's preexisting artherosclerotic disease, made him more vulnerable to a spasm, which likely caused the closure of the right PICA.

Also of significance is the fact that claimant's health was good prior to the subject accident and that, following same, his condition of ill-being manifested itself and persisted. There was no evidence that he had suffered any previous spells or incidents. On the date in question, claimant had been working for at least hours at the very strenuous task of assembling a radiator. During this extended period of exertion, he suddenly experienced numbness on his left side, along with symptoms of confusion and disorientation. Both claimant and his wife testified that, since June 14, 1985, he had continuously experienced disorientation and lack of coordination, particularly on his left side. Claimant's effort to return to work in April 1986 reflected his incapacity to perform the only type of work he had ever done in his work career.

We conclude that the Commission's determination of this issue is not against the manifest weight of the evidence.

■ Next, the employer contends that the Commission erred in finding that claimant was permanently and totally disabled. The employer contends that there is no medical evidence to support such a finding. It points out that no physician stated that claimant was permanently and totally disabled, nor did claimant himself state that he was unable to work at any job. The employer further argues that claimant did not make a *prima facie* case of permanent and total dis-

ability and also did not prove that he fell into the "odd lot" category. (*Valley Mould & Iron Co. v. Industrial Comm'n* (1981), 84 Ill. 2d 538.) In response, claimant contends that the evidence in the appeal at bar fully supports the Commission's conclusion that claimant is totally and permanently disabled.

As we have often stated, the determination of the extent and permanency of claimant's medical disability is a question of fact for the Commission, and its decision will not be set aside unless it is against the manifest weight of the evidence. *Zion-Benton Township High School District 126 v. Industrial Comm'n* (1993), 242 Ill. App. 3d 109, 115.

The testimony of Drs. Tuttle and Greenberg provides support for the Commission's decision in regard to this issue. Dr. Tuttle first saw claimant on June 25, 1986. At that time, he was complaining of daily headaches, dizziness, disorientation, and left-sided numbness. Dr. Tuttle stated that, over the years of treating claimant, these symptoms had merely stabilized, not diminished. He thought that claimant's condition was permanent. Accordingly, he opined that claimant was incapable of handling a job which required him to follow directions, use his hands, or "have to get around." Further, Dr. Greenberg thought that even light exertion might cause "a full-blown stroke that might render [claimant] severely paralyzed." Add to this the claimant's description of his inability to hold objects, his problems with falling, and his persistent disorientation, all of which the arbitrator found "very credible."

The evidence clearly demonstrates that claimant's condition of ill-being was permanent and that he was unable to perform any employment for which a reasonably stable market exists. Indeed, it would be extremely difficult, if not impossible, to imagine any type of employment for which claimant is suited, due to the constraints imposed by the subject injury.

Given our determination of the first two issues, we need not address the employer's argument that claimant is not entitled to any medical expenses.

For reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, SLATER, and RARICK, JJ., concur.