ROBERT D. WILLIAMS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (U.S. Steel Supply Corporation, Division of U.S. Steel Corporation, Appellee).

First District (Industrial Commission Division)   No. 1—91—2954WC

Opinion filed March 19, 1993.

Cohn, Lambert, Ryan & Schneider, Ltd., of Chicago (Michael R. Schneider, of counsel), for appellant.

Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., and Burke, Burns, Ellison, & Pinelli, both of Chicago, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Claimant Robert D. Williams appeals from an order of the circuit court confirming the finding of the Industrial Commission (Commission) that he failed to prove accidental injuries arising out of his employment under a theory of repetitive trauma. The arbitrator, Herbert Auw, issued his memoranda of decision on November 3, 1988, finding claimant sustained repetitive trauma to his cervical spine while performing his duties as a millwright for respondent and was permanently and totally disabled as of April 23, 1985, and ordering claimant to receive $320 a week for life from respondent. The Commission reversed, finding claimant failed to prove he sustained injuries arising out of and in the course of his employment on April 23, 1985. The circuit court confirmed the Commission's decision and claimant appeals.

Claimant began working for respondent U.S. Steel Supply Corporation in 1963 and held positions of helper, sheet shear operator and crane operator. Claimant was employed as a crane operator for 9 of the first 10 years he was employed by respondent. As a crane operator, he was required to climb in and out of a crane several times during his shift.

In 1973, claimant began working as a millwright for respondent. His last day of work was April 23, 1985.

Claimant testified that part of his job required lifting machine parts that weighed anywhere from 30 to 60 or 70 pounds apiece. He would lift such objects about two times a day and he estimated he

would spend approximately 30% of his time on each shift lifting objects of this weight range. He would climb on top of a crane approximately five or six times a day. He would also crawl under certain machinery in order to perform repairs. This crawling would involve lying on his back or stomach and crawling under the machine. He would crawl in such a manner two to three hours per day on a daily or weekly basis. Claimant used 8-, 12-, and 16-pound sledgehammers for two or three hours a day on a daily basis and was required to operate a hydraulic air hammer to break up concrete approximately once every six months.

Claimant utilized various sizes and weights of tools including pipe wrenches, chain saws, sledgehammers and box wrenches. These tools ranged in size from 2½ to 24 inches and in weight from 3 or 4 to 15 and 20 pounds. Claimant, who was over six feet tall, testified much of the work he was required to do was in small spaces which caused him to have to contort his body into awkward positions, such as "buckling [my] head," stooping or bending over. Claimant estimated the spaces in which he was required to work were anywhere from one foot to four feet smaller than he was. Finally, approximately two hours per day would be spent waiting for a job assignment.

He testified that in 1968 he was involved in an automobile accident and suffered a fractured mandible and was out of work for approximately 18 weeks as a result of this accident. In the summer of 1984, he began experiencing charley horses in both of his legs and feet at night after he went to bed. Claimant could not get into a comfortable position to ease the pain. He testified he began making more frequent visits to the health club which helped alleviate this problem. In September or October 1984, claimant began to notice weakness in his right leg after climbing or walking during the day. He continued to visit the health club to gain strength in his legs and ease this weakness and pain. Despite the weakness and pain, claimant continued to work as a millwright and perform all the tasks previously described. Claimant described the weakness in his legs as extending from his thigh all the way through the knee and ending in his calf. In February or March 1985, claimant began having muscle spasms on both sides of his upper back.

Claimant went to Chicago Osteopathic Hospital on April 9, 1985, to seek medical treatment for this weakness and the muscle spasms. The doctors at Chicago Osteopathic told claimant that he should not return to work. Claimant ceased working on April 23, 1985.

Claimant was admitted to Chicago Osteopathic Hospital on May 7, 1985, for a series of tests. Claimant was discharged on May 11, 1985,

and readmitted on June 17, 1985. On June 24, 1985, claimant was transferred to Rush-Presbyterian-St. Luke's Hospital by ambulance, where he remained until July 5, 1985. His attending physician, Dr. Walter Whisler, performed surgery on claimant's neck. Respondent sent claimant to two other doctors, Dr. J. Claro and Dr. David Rozenfeld. Claimant stated he still felt stiffness in his lower back, arms, legs and hands as well as constant pain in his legs, arms, and left shoulder.

On cross-examination, claimant admitted he was suspended from his job for six months in 1983. He clarified the fact that he had a partner who helped him move the office furniture when they were so required. Claimant agreed that he lifted a variety of objects which varied in weight and size and he stated he would not use a sledgehammer regularly and rarely used an air hammer. Claimant admitted there was no single activity he would perform constantly and continually throughout the day.

He testified the first time he notified respondent regarding his condition was upon his first visit to Chicago Osteopathic. Claimant admitted he continued working full days and overtime despite his worsening condition. Finally, claimant admitted he was diagnosed as a diabetic in 1978, recognized he was an alcoholic in 1980 and was in a car accident in 1965 in which he suffered whiplash.

Thomas Gleason testified that from 1980 to 1985 he was the manager of operations for respondent and ran the Chicago district plant. Gleason stated that a millwright was responsible for mechanical repair and preventative maintenance of the equipment at the plant as well as maintenance work on the exterior grounds. Gleason testified there was no particular activity that a millwright would perform on a daily basis. Gleason explained it would be impossible to specify the types and frequency of lifting objects that a millwright would have to do because he believed millwrights were not required to do much lifting. He estimated that less than 5% of a millwright's time was spent lifting heavy objects. Finally, Gleason testified claimant would not have had to lift an object weighing more than 50 pounds without assistance and that it would be rare for a millwright to use a sledgehammer. Gleason, who was the same height as claimant, testified he had no problems getting in and out of the spaces in which claimant had to work.

The evidence deposition of Dr. Scott A. Kale was taken on August 4, 1988. Dr. Kale was provided with claimant's medical records from Dr. Claro, Dr. Whisler, as well as those from Chicago Osteopathic Hospital. Dr. Kale opined that claimant suffered from neuromedical

problems related to a C5-C6 herniated disc. Dr. Kale further opined that claimant's employment activities were associated with his medical problems. Specifically, Dr. Kale explained that in a man of claimant's age, disease of the neck has one of two origins, congenital or traumatic. Dr. Kale stated that since there was no evidence of congenital disease, the origin of claimant's disease had to be traumatic. Dr. Kale testified this trauma, which caused claimant's medical problems, was work trauma resulting from the repetitive heavy lifting, distortions, and manipulations of claimant's neck. Dr. Kale explained he believed claimant's herniated disc resulted from repetitive trauma through distortion of his neck over a period of years. Dr. Kale stated the repetitive use of heavy tools, through vibration, twisting and turning, lifting and straining of claimant's neck, led to the herniated disc.

On cross-examination, Dr. Kale indicated that his opinion as to the origin of claimant's medical problems would not be changed even though the activities allegedly causing the trauma were not performed on a regular basis. Dr. Kale testified he did not base his opinion on the frequency of those activities but rather the effect they had on claimant's body. Dr. Kale stated that his opinion as to the origin of claimant's injury would also not change because of the fact that claimant was in an automobile accident in 1965 in which he suffered a contusion and strain to his neck and chest. Dr. Kale agreed that acute trauma rather than repetitive trauma could cause the type of injury claimant suffered but that the length of time between the auto accident and the appearance of these symptoms was too long for the auto accident to be a cause of claimant's medical problems.

Respondent offered into evidence the deposition of Dr. John Dwyer. Dr. Dwyer reviewed Dr. Kale's deposition as well as claimant's medical and employment records. Dr. Dwyer explained that a peripheral neuropathy is a biochemical disease that affects the nerves and that heavy drinkers and diabetics often experience this disease. Dr. Dwyer indicated the facts that claimant was both an alcoholic and a diabetic was "definitely a possible and probable causative factor" that claimant suffered from a peripheral neuropathy which indicated claimant's injuries were degenerative in nature rather than the result of repetitive trauma from his employment activities.

Also admitted into evidence were 19 claim forms for sickness and accident benefits. Two of these forms were signed by Dr. Anthony Dekker and indicated claimant's injury did not arise out of his employment. One claim form was signed by Dr. George Cybulski and indicated it was undetermined whether claimant's injury arose out of his employment. The remaining claim forms were signed by Dr. Walter

Whisler and indicated it was undetermined whether claimant's injuries arose out of his employment. Dr. Dekker was claimant's attending physician at Chicago Osteopathic, while Doctors Cybulski and Whisler were claimant's physicians at Rush-Presbyterian-St. Luke's Hospital.

Claimant contends he sufficiently established that his physical activities in performing his work duties were repetitive in nature thus sustaining his theory of repetitive trauma. Claimant argues the Commission improperly found there was no evidence of repetitive trauma in his case by concluding his case was different than the type of work performed in *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 505 N.E.2d 1026, and its progeny. Claimant admits he did not perform the same task every day but suggests he did perform a limited number of rigorous tasks in awkward positions on a regular cycle over a period of 12 years which involved the lifting and turning of his neck and back. Respondent suggests the claim forms for accident and sickness benefits, the conflicting medical testimony, and claimant's own testimony support the Commission's decision.

■ An employee seeking benefits for gradual injury due to repetitive trauma must meet the same standard of proof as a petitioner alleging a single, definable accident. The petitioner must prove a precise, identifiable date when the accidental injury manifested itself. "Manifested itself" means the date on which both the fact of the injury and the causal relationship of the injury to the petitioner's employment would have become plainly apparent to a reasonable person. The test of when an injury manifests itself is an objective one, determined from the facts and circumstances of each case. (*Three "D" Discount Store v. Industrial Comm'n* (1989), 198 Ill. App. 3d 43, 47, 556 N.E.2d 261, 264, *appeal denied* (1990), 135 Ill. 2d 567.) In cases relying on the repetitive-trauma concept, the claimant generally relies on medical testimony establishing a causal connection between the work performed and claimant's disability. (*Nunn v. Industrial Comm'n* (1987), 157 Ill. App. 3d 470, 477, 510 N.E.2d 502, 506.) There must be a showing the injury is work-related and not the result of a normal degenerative aging process. (*Peoria Belwood*, 115 Ill. 2d at 530, 505 N.E.2d at 1028.) A claimant need only prove that some act or phase of employment was a causative factor of the resulting injury. *Three "D" Discount Store*, 198 Ill. App. 3d at 49, 556 N.E.2d at 265.

■ It is the function of the Commission to judge the credibility of witnesses, determine the weight to be given to their testimony, and to draw reasonable inferences from that testimony. (*Berry v. Industrial*

*Comm'n* (1984), 99 Ill. 2d 401, 406, 459 N.E.2d 963, 966.) The question of causation is one of fact for the Commission, and its determination will not be overturned unless the finding is against the manifest weight of the evidence. (*Three "D" Discount Store*, 198 Ill. App. 3d at 49, 556 N.E.2d at 265.) Even if one of the medical witnesses was equivocal on the question of causation, it is for the Commission to decide which medical view is to be accepted, and it may attach greater weight to the opinion of the treating physician. (*International Vermiculite Co. v. Industrial Comm'n* (1979), 77 Ill. 2d 1, 4, 394 N.E.2d 1166, 1168.) A reviewing court may overturn the Commission's factual determinations only when they are against the manifest weight of the evidence. *Anderson Clayton Foods v. Industrial Comm'n* (1988), 171 Ill. App. 3d 457, 459, 526 N.E.2d 844, 846.

In *Peoria Belwood*, claimant's duties required her to carry bags of laundry each weighing between 25 and 50 pounds. After sorting the laundry in these bags, she would load two 200-pound-capacity washing machines by operating a spring-loaded door into each of three compartments. Claimant performed such a task at least six times a day. The supreme court concluded claimant established an accidental injury under a repetitive-trauma theory. The medical testimony she presented was uncontroverted and her testimony regarding the repetitive nature of her job task was uncontroverted. (*Peoria Belwood*, 115 Ill. 2d at 530, 505 N.E.2d at 1028.) Similarly, in *Three "D" Discount Store*, claimant's job was as a "buffer man," which required him to use one of two buffing machines. Claimant was required to use the buffing machine to scrub, wax and buff the floors and he worked from six to eight hours a day. The court concluded claimant sustained his burden in proving repetitive trauma where no evidence was presented to rebut his expert's opinion of causation. (*Three "D" Discount Store*, 198 Ill. App. 3d at 49, 556 N.E.2d at 265.) Finally, in *Oscar Mayer & Co. v. Industrial Comm'n* (1988), 176 Ill. App. 3d 607, 531 N.E.2d 174, claimant was employed in a hog slaughtering facility where he was required to perform repeated arm, shoulder and hand movements for 15 years, which was sufficient to establish an injury under a repetitive-trauma theory.

In *Perkins Products Co. v. Industrial Comm'n* (1942), 379 Ill. 115, 39 N.E.2d 372, the claimant was engaged in packing displays in cartons. In doing her work she would turn and reach back to the supply of displays on the bench behind her, pick up three displays at a time in her hand and bring the same around and place them in the cartons on the table in front of the operator. This movement of her body and arm was repeated in every operation. (*Perkins*, 379 Ill. at

118, 39 N.E.2d at 373.) In upholding the Commission's award, the court noted that the claimant's injury "was directly connected with the manner and method in which she was required to do her work, and to use her arm in the discharge of her duties." *Perkins*, 379 Ill. at 120, 39 N.E.2d at 374.

■ These cases are factually distinguishable from the case before us. In those cases where the courts sustained a theory of repetitive trauma, the claimant in each one conclusively established a repetitive job task. In each case, the claimant performed the same task in a repetitive fashion on a daily basis. Here, claimant admitted there was not a single task he performed regularly or on a daily basis. He stated he could perform a specific task one day and then not do it again for months at a time. Likewise, claimant did not use any particular tool or any object on a daily basis nor did he have to lift any particular object on a daily basis. The Commission's determination that the nature of claimant's job does not support a repetitive-trauma theory is not against the manifest weight of the evidence.

Moreover, there was conflicting medical evidence as to the cause of plaintiff's injury. Claimant's expert testified it was from his employment activities, while respondent's expert testified claimant's injury could be degenerative in nature because of his diabetes and alcoholism. Claimant's treating physicians did not testify, but the claim forms, for whatever evidentiary value they may have, stated it was either undetermined whether these injuries arose from his employment or that these injuries did not arise from employment. The Commission determined the credibility of witnesses, and it chose to find respondent's medical expert more credible than claimant's medical expert. Finally, there was evidence to suggest that other factors, such as the 1965 automobile accident, could have been a cause of claimant's injury.

Therefore, the Commission's decision finding that claimant failed to establish accidental injuries arising out of his employment under a theory of repetitive trauma was not against the manifest weight of the evidence.

Affirmed.

RAKOWSKI, WOODWARD, STOUDER, and RARICK, JJ., concur.