THE CITY OF SPRINGFIELD, ILLINOIS, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Kevin Magerl, Appellee).

Fourth District    No. 4—08—0170WC

Opinion filed February 11, 2009.

Dennis S. O'Brien (argued), of Livingstone, Mueller, O'Brien & Davlin, P.C., of Springfield, for appellant.

Thomas R. Ewick (argued), of Shay & Associates, of Springfield, for appellee.

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Claimant, Kevin Magerl, age 46, filed an application for adjustment of claim for repetitive wrist, elbow, and arm trauma injuries, pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2004)), he allegedly suffered while in the employ of respondent, the City of Springfield, Illinois. The application for adjustment of claim sought no compensation for lost time from work, but sought past and future medical benefits. Following a section 19(b) hearing, an arbitrator, on September 6, 2005, found that claimant suffered an accidental injury on March 24, 2004, arising out of and in the course of his employment with respondent. In his decision, the arbitrator concluded that claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes were causally related to a March 24, 2004, work-related accident. The arbitrator awarded claimant $3,626 pursuant to section 8(a) of the Act for past medical expenses, and also awarded claimant prospective medical benefits consisting of several surgical procedures prescribed by claimant's treating physician and "related medical care."

Respondent sought review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). In its

statement of exceptions, respondent propounded five questions to the Commission pursuant to section 19(e) of the Act. On October 26, 2006, the Commission affirmed and adopted the arbitrator's September 6, 2005, decision, and did not provide answers to respondent's questions.

Respondent then sought judicial review of the Commission's October 26, 2006, decision in the circuit court of Sangamon County. On February 16, 2007, the circuit court remanded the case to the Commission ordering an amended decision be entered to include answers to the questions previously propounded by respondent.

The Commission issued an amended decision and opinion on August 14, 2007, and provided answers to respondent's questions, which are noted in the background section that follows. The Commission again affirmed the arbitrator's September 6, 2005, decision but found claimant entitled to $0.32 more for past medical expenses and modified the award accordingly.

On January 25, 2008, the circuit court confirmed the Commission's August 14, 2007, decision. Respondent was granted leave to file a late notice of appeal by this court on March 18, 2008.

## ISSUES ON APPEAL

1. Whether the Commission complied with the requirements of section 19(e) of the Act.

2. Whether the Commission's finding that an accident occurred which arose out of and in the course of claimant's employment with respondent was against the manifest weight of the evidence.

3. Whether the Commission's finding that claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes were causally related to a work-related accident was against the manifest weight of the evidence.

4. Whether the Commission's finding that Dr. Neumeister's proposed medical treatment consisting of several surgical releases pertaining to claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes are reasonable and necessary, and whether the Commission's award of the prospective surgeries prescribed by claimant's treating physician and "related medical care" based on that finding is against the manifest weight of the evidence.

## BACKGROUND

The following factual recitation is taken from the evidence presented at the section 19(b) arbitration and review hearings. At the arbitration hearing, claimant testified that he was employed as an electrician for City, Water, Light & Power (the City), and has worked in that capacity since July 8, 1996. Prior to his hiring, claimant

underwent a preemployment physical examination, which he passed. Claimant was an apprentice electrician during his first year of employment with the City.

Claimant has been employed at the City's Dahlman Powerhouse since his hiring in 1996. Claimant testified that his work for the City involved maintaining "everything having to do with controls, measurements, levels, emissions and computer equipment." He ordinarily worked eight hours a day, five days per week and occasionally worked overtime. He testified that his work involved the use of numerous types of tools including twisting screwdrivers, wrenches, socket drivers, wire cutters, wire crimpers, pullers, channel locks, electric drills, battery-operated drills, hammer drills, a matavos grinding wheel used for cutting metal and grinding and a "saw-zaw," which is a reciprocal blade cutting device. At times, claimant's work also involved the use of pneumatically driven tools. In an eight-hour work day, claimant used one of these tools twisting and turning his wrists and hands for about five hours, although he would sometimes use one of the tools for eight hours a day.

Claimant testified that his work for the City also required him to climb scaffolding and ladders and that doing so required the use of his arms. Claimant testified that during the week of the arbitration hearing he was required to replace an old "monitoring system." Claimant was required to climb a "stack" and pull out the old monitoring system, which measured air particulates, and bring it down. He then mounted a new monitoring system in the place of the old one. He testified that he climbed up and down a ladder twice that day.

Claimant testified that other work activities involved reaching up to grab wire which is often located near hot equipment and steam pipes, and pushing wrenches, channel locks, screwdrivers, as well as dollies and carts which he used to move equipment. He also testified that his work involved grasping and turning screwdrivers, wrenches, sockets, drills; pulling and turning wires, channel locks, and computer mice when he was required to reprogram computers.

Claimant testified that the Dahlman plant vibrated constantly due to the plant's boiler system. He also testified that he used vibratory tools daily, although the amount of his use of these tools per day varied. An attribute report admitted into evidence indicated that claimant's work was listed as a Level B, typical of machine operators, mechanics, and other skilled tradespeople. The attribute report states that people listed in a Level B work category work both indoors and outdoors and are exposed to extreme cold and heat for periods of more than one hour. The attribute report also stated that claimant's level of work was "medium," meaning that his work requires him to exert up to 50

pounds of force occasionally, and/or up to 20 pounds of force constantly to move objects. Claimant testified that he is right-hand dominant, although he is ambidextrous when using tools.

Claimant testified that he began to first notice physical problems with both his hands and arms in March 2004. He testified that at that time he experienced severe pain in his right hand that radiated to his right elbow and also experienced pain in his left hand and arm. He had "terrible" pain if either elbow came into physical contact with any object. He testified that he had trouble gripping screwdrivers and channel locks.

Claimant testified that he first sought medical treatment from Dr. William Yu of Springfield Priority Care, claimant's family physician, on March 17, 2004. At that time, claimant reported severe pain in his right hand that radiated throughout his right arm. Claimant reported that the pain in his right hand was exacerbated when shaking hands with others. He also reported that his left arm would "fall asleep" regularly. Dr Yu's medical notes indicate that claimant was ambidextrous, but used his right hand and arm more than his left hand and arm. Dr. Yu referred claimant to Dr. Edward Trudeau, a neuromusculoskeletal specialist of the Memorial Medical Center in Springfield.

Claimant presented to Dr. Trudeau on March 17, 2004, and underwent an electromyography (EMG). At that time, claimant reported pain in both arms, particularly with overhead usage. He also reported "nocturnal awakening" associated with pain in the distal upper extremities, particularly the right upper extremity. Claimant reported that the difficulties with his upper extremities were both aggravated and precipitated by his work duties. Dr. Trudeau's medical notes also indicate that claimant had suffered an unrelated crush injury of his left middle finger and was treating with Dr. Michael Neumeister, a hand and plastic surgeon of the Southern Illinois University Medical Center, for that injury. Upon examination, Dr. Trudeau found weakness of the ulnar innervated intrinsics of claimant's right hand, but not the left. A compression test rendered a positive result over the median nerve in both wrists, but was greater in claimant's right wrist. Dr. Trudeau also found a positive Tinel's sign over the ulnar nerve at the right elbow and a mildly positive Tinel's sign over the ulnar nerve at the left elbow.

Dr. Trudeau opined that claimant's injuries were work related. Dr. Trudeau noted that claimant performed fine motor activities with his hands, that he routinely twisted wires, used pliers, handled small objects, and had frequent and repetitive hand usage throughout his work shifts. Dr. Trudeau noted that "detailed nerve conduction studies revealed bilateral prolongations of median motor and sensory laten-

cies as compared to ulnar. Decrement of evoked response with above to below stimulation in the right ulnar motor distribution, along with slowing of motor conduction velocity across elbow." Dr. Trudeau diagnosed claimant with bilateral carpal tunnel syndrome; "right greater than left." Dr. Trudeau also diagnosed claimant with right arm cubital tunnel syndrome. Dr. Trudeau opined that claimant's work duties involving repetitive usage of the upper extremities may also have contributed to an "overuse syndrome" of the upper extremities. Dr. Trudeau's medical notes listed conservative treatment options as well as corrective surgical options. The conservative treatment options that were listed in Dr. Trudeau's medical notes are the following: physical therapy, warm packs, deep sedative massage, ultrasound, range of motion exercise, strengthening exercise, nerve intended grinding exercise, stretching, injections into the wrists or elbows, electronic nerve stimulation, and anti-inflammatory or analgesic medications.

Claimant testified that following Dr. Trudeau's examination, he was referred to Dr. Neumeister. Claimant testified that he sought treatment from Dr. Neumeister regarding his upper extremity pain on April 1, 2004. As noted, claimant was already treating with Dr. Neumeister for the unrelated injury to his left middle finger. Dr. Neumeister's medical records reveal an overlap in treatment of claimant's upper extremity conditions and finger injury. On April 1, 2004, Dr. Neumeister prescribed conservative treatment for claimant's upper extremity ailments including the use of splints and restricted claimant to right-hand work only. Dr. Neumeister's medical notes of that same day indicate that he mailed a letter seeking approval for surgical decompression to claimant's upper extremities to respondent's worker compensation insurance provider. Claimant treated with Dr. Nuemeister again on April 19, 2004, and in May 2004 for his unrelated finger injury and apprised the doctor with regard to his upper extremity conditions on those dates. On April 19, 2004, Dr. Neumeister noted that conservative treatment for claimant's upper extremity ailments had failed and that he would recommend surgery after claimant's finger condition had resolved.

On May 2, 2005, claimant was examined by respondent's physician, Dr. Mitchell Rotman, an orthopedic surgeon, pursuant to section 12 of the Act. Claimant testified that a nurse performed some electrical testing. Claimant testified that Dr. Rotman was not present during most of the examination. In his May 2, 2005, report, Dr. Rotman noted that claimant was being examined pursuant to section 12 of the Act. His notes indicate that claimant reported that his work was repetitive and hand intensive. Claimant complained of numbness and pain in his upper extremities; left greater than right. Claimant also reported

decreased grip strength and swelling of both wrists and hands, especially at the end of the work day. Claimant reported that he was awaiting approval for surgery. Claimant reported that the use of wrist splints aggravated his symptoms. Claimant reported that his work involves repetitive elbow flexion and extension and occasional awkward positioning in small spaces. Dr. Rotman noted that claimant's work is largely self-paced. Claimant reported frequent overhead work.

Dr. Rotman noted Dr. Trudeau's and Dr. Neumeister's medical notes. Upon examination, Dr. Rotman noted full bilateral elbow range of motion and no swelling or clicking of either arm. He noted a positive Tinel's sign over the cubital tunnels and noted a positive elbow flexion test on both arms. Upon examination of the hands, Dr. Rotman found full range of motion of the wrists and digits with no swelling. He noted that claimant's upper extremities showed no muscle atrophy. Dr. Rotman opined that there was no evidence of entrapment neuropathy. Dr. Rotman opined that he would not recommend claimant undergo surgery. Dr. Rotman opined that symptoms of pronator tunnel syndrome are referred from the carpal tunnel and that the symptoms will normally dissipate after an isolated carpal tunnel release. He did not offer an opinion as to whether claimant's ailments were causally related to his work activities.

Claimant treated with Dr. Neumeister on December 2, 2004, again with regard to his finger injury. On that date, Dr. Neumeister examined claimant's upper extremities and recommended surgery. Dr. Neumeister diagnosed claimant with bilateral cubital tunnel syndrome, bilateral carpal tunnel syndrome, and bilateral pronator syndrome, "left greater than right." Dr. Nuemeister found that claimant's conditions warranted surgical releases and that he was awaiting approval for the surgeries from the City's worker compensation insurance provider.

Claimant testified that as of the date of the arbitration hearing, he continued to have problems with his hands falling asleep and also continued to experience pain when gripping tools. He testified that the pain was worse in his right hand. He testified that both of his elbows were sensitive and at times extremely painful. He testified that Dr. Rotman did not test his left elbow.

On cross-examination, claimant testified that he had not been absent from work as a result of his ailments. Claimant testified that after commencing treatment with Dr. Neumeister, he treated with the use of wrist splints for approximately two weeks at nighttime but that the splints caused him more pain. He testified that he had not undergone physical therapy after treating with Dr. Neumeister, that he had not received warm packs or deep sedative massage or

ultrasound for his hands or arms and that he had never been instructed on range of motion exercises or strengthening exercises for his hands. He testified that he never made requests for work modification or ergonomic changes in his work, nor had he received any injections into his wrists or elbows. Claimant testified that he had not treated with any type of electronic nerve stimulator and that Dr. Neumeister had not prescribed him anti-inflammatory or pain medication.

Claimant testified that it was not until May 2004 that Dr. Neumeister recommended surgery. Claimant testified that he was unaware that on April 1, 2004, Dr. Neumeister had written a letter requesting authorization to perform six different surgical procedures.

Claimant testified that his work was varied, that it his work duties were sometimes different from day to day and even from hour to hour. He testified that he may use one type of tool in the course of his work for half an hour and then use a different tool for the next half hour. He testified that the nature of his work was such that he would perform a number of different tasks. He testified that there were weeks where he would perform a single task for the entire week. He testified that some of the instruments he worked on were heavy while others were very light.

Claimant testified that with regard to Dr. Rotman's note that his work was self-paced, he did not have to perform work as if he were employed on an assembly line, that the machinery he worked on or repaired did not operate at a pace that he had to keep up with, and that his work was not dictated by machine.

On redirect examination, claimant testified that he did not know if there was an easier way for him to perform his duties and that all of the tools he used were provided to him by the City.

On re-cross-examination, claimant testified that while his work involved repairing and maintaining equipment, his work varied with regard to the size, shape, and weight of the equipment he maintained.

David Gurnsey was called as a witness at the section 19(b) arbitration hearing by claimant. Gurnsey testified that he was employed as the assistant business agent of the International Brotherhood of Electrical Workers (IBEW) Local 193, an electrical worker labor union. At the time of the arbitration hearing, Gurnsey had held that position for three years. Prior to that, he was employed as a maintenance electrician at the Dahlman plant and was familiar with claimant, and the type of work that claimant performed, as he had performed work similar to that of claimant. Gurnsey testified that claimant's work involved a great deal of mechanical equipment and involved maintaining all the electrical equipment at the Dahlman plant. He testified

that the Dahlman plant was seven stories high, so claimant's work involved walking and climbing, and that some equipment occupied areas that were not easily accessible, which required claimant to climb, kneel, or bend down often.

Gurnsey described the types of tools involved in claimant's work, and testified that on any given work day claimant or others performing the same work could use tools for up to six hours a day, generally using tools for four to six hours per day. Gurnsey testified that when operating a drill, claimant would have to sometimes push on the drill with a great deal of force as some of the steel in the plant was thick. He testified that pulling wire is often performed when installing new monitors and that the work requires grasping.

On cross-examination, Gurnsey testified that in his current employment he was employed by the approximately 800 members of IBEW 193, including claimant, and that it was his desire to keep those members "happy," referring to them as "brothers." He also testified that his employment with the City was not exactly the same as claimant's and that claimant would perform tasks that he did not perform and vice versa.

On redirect examination, Gurnsey testified that he appeared at the arbitration hearing pursuant to subpoena and that he served at the will of IBEW 193's business agent and was not elected by the union members.

On re-cross-examination, Gurnsey testified that the IBEW 193's business agent was elected, and that if union members were unhappy with him, the business agent would "let him know it."

Dr. Neumeister provided an evidence deposition in this case. He testified that he is a board-certified hand and plastic surgeon. He testified that he reviewed Dr. Trudeau's medical notes, as well as his own medical notes in preparation for his testimony at deposition. Dr. Neumeister testified that claimant's work involved twisting wires, using pliers, and also involved frequent and repetitive hand usage during his entire work shift. He opined that claimant's work aggravated the symptoms of claimant's bilateral carpal tunnel, cubital tunnel, and pronator syndromes. He testified that he was awaiting approval from the City's worker compensation insurance provider for surgery. Dr. Neumeister testified that he prescribed surgery due to the significant nerve compression that Dr. Trudeau had found.

Dr. Neumeister testified that positive provocative signs in compression tests are an indication of nerve compression. Dr. Neumeister described the proposed surgeries as a release of the carpal tunnel at the wrist, release of the median nerve at the pronator at the proximal forearm and release of the ulnar nerve at the elbow cubital tunnel. Dr.

Neumeister testified that the proposed surgeries are reasonable and necessary to relieve claimant's symptoms. He opined that claimant's conditions of ill-being will probably not improve without surgery. He opined that claimant may have some resolution of his symptoms with rest, but that this was unlikely because of the severity of claimant's symptoms as noted in Dr. Trudeau's medical notes.

On cross-examination, Dr. Neumeister testified that claimant provided a history to Dr. Trudeau of his upper extremities being aggravated and precipitated by his work duties. Dr. Neumeister testified that claimant had no muscle atrophy in his upper extremities. Dr. Neumeister admitted that Dr. Trudeau had not diagnosed left cubital syndrome or bilateral pronator compression. Dr. Neumeister admitted that there was no indication in Dr. Trudeau's notes regarding how often claimant performs the act of twisting wires or how long he uses tools. Dr. Neumeister testified that he does not know in what manner claimant performed his work tasks.

Dr. Neumeister testified that the EMG performed by Dr. Trudeau did not show an abnormality in claimant's left ulnar nerve at the cubital tunnel. Dr. Neumeister testified that his April 1, 2004, notes indicate that he would treat claimant's ailments conservatively including the use of splints, and did so and it did not work. Dr. Neumeister also testified that he mailed a letter to the City's worker compensation insurance provider on April 1, 2004, requesting approval for surgical decompression. Dr. Neumeister testified that although he recommended surgery to claimant in May 2004, he was seeking approval for the surgeries since April 1, 2004, because approval for surgery generally took a long time.

Claimant submitted past medical bills totaling $3,626.32 at the section 19(b) arbitration hearing; the medical bills were admitted into evidence.

As noted, an arbitrator on September 6, 2005, found that claimant suffered an accidental injury on March 24, 2004, arising out of and in the course of his employment with respondent. In his decision, the arbitrator found that claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes were causally related to a March 24, 2004, work-related accident. The arbitrator awarded claimant $3,626 for past medical services performed pursuant to section 8(a) of the Act, and also awarded claimant prospective medical benefits consisting of the several surgical procedures recommended by Dr. Neumeister and other medical care incident thereto.

Respondent sought review of the arbitrator's decision before the Commission. In its statement of exceptions, respondent propounded five questions to the Commission pursuant to section 19(e) of the Act. The five questions propounded were as follows:

"Question 1: What job task did [claimant] perform in a repetitive manner?

\* \* \*

Question 2: Was Dr. Neumeister's diagnosis of left cubital tunnel and bilateral pronator syndrome confirmed or contradicted by the physical examinations and electro-diagnostic testing of Drs. Trudeau and Rotman?

\* \* \*

Question 3: Is it reasonable to perform pronator syndrome surgery at the same time as carpal tunnel syndrome when the evidence at arbitration indicates that symptoms of pronator tunnel are referred from the carpal tunnel and generally go away after an isolated carpal tunnel release?

\* \* \*

Question 4: Is it reasonable to perform six surgeries when recommended conservative treatment, including physical therapy, warm packs, deep sedative massage, ultrasound, range of motion exercises, strengthening exercise, nerve intended grinding exercise, stretching exercise, mobility exercises, work modifications or ergonomic changes in work, injections into [claimant's] wrists or elbows, electronic nerve stimulator, anti-inflammatory medications or analgesic medications have not been attempted?

\* \* \*

Question 5: Is Dr. Neumeister's testimony credible, given [claimant's] testimony that he did not recommend surgery until May 2004 and Dr. Neumeister's testimony that he did not recommend surgery until May 2004, while Dr. Neumeister on April 1, 2004, the first date he saw [claimant], requested authority to perform six surgeries?"

On October 26, 2006, the Commission affirmed and adopted the arbitrator's September 6, 2005, decision without answering the five questions.

As noted, respondent sought judicial review of the Commission's October 26, 2006, decision in the circuit court of Sangamon County. On February 16, 2007, the circuit court remanded the cause to the Commission ordering an amended decision be entered to include answers to the questions previously propounded by respondent.

The Commission issued an amended decision and opinion in this case on August 14, 2007. The Commission again affirmed the arbitrator's September 6, 2005, decision but found claimant entitled to $3,626.32 for past medical benefits. The Commission answered the five questions propounded by respondent as follows. With regard to Question 1, the Commission found:

"[Claimant] testified that while performing his job, he used all

sorts of hand tools, including screwdrivers, wrenches, socket drivers, wire cutters, wire crimpers, pullers, channel locks, electric drills, battery operated drills, hammer drills, a matavos grinding wheel used for cutting metal and grinding and a saw-zaw which is a reciprocal blade cutting device and at times he used pneumatic driven tools. Out of an 8 hour work day, [claimant] used one of these tools around 5 hours, but it could be as much as 8 hours, depending on the things that needed to be done.

[Claimant] also testified that [he] climbed stairs, scaffolding and ladders that are up the side of the stacks which required [claimant] to use his arms and upper extremities. Gurnsey testified as to the climbing involved and the tools used by [claimant] up to [six] hours a day, depending on what he was doing. Gurnsey testified that [claimant] would push a drill motor when cutting through thick steel, that he pulled wire or cable trays and would do this quite a bit when installing new motors, that he grasped hand tools such as channel locks and wrenches and was twisting constantly, that he would be twisting wire and cutting wire and twisting his wrists and elbows and was constantly gripping when cutting wires, using wrenches and ratchets and when disconnecting wires using a screwdriver or wrench. *** [Claimant] was subjected to extreme cold and heat and vibration of the extremities or whole body and working on scaffolding and high places, which he would have to climb to, and exerting up to 50 pounds of force occasionally and/or up to 20 pounds of force constantly to move objects. While [claimant's] duties may not have been 'repetitive' in a sense that the same thing was done over and over again as on an assembly line, the Commission finds that his duties required an intensive use of his hands and arms and his injuries were certainly cumulative.

The Commission affirms the arbitrator's finding that a causal relationship exists between those injuries and [claimant's] conditions of ill-being, based on Dr. Neumeister's opinions and on Dr. Trudeau's EMG report. The Commission notes that *** Dr. Rotman did not give an opinion regarding causation."

With regard to Question 2, the Commission found:

"Dr. Neumeister's diagnosis of left cubital tunnel and bilateral pronator syndrome [was] based on his clinical examination.

The Commission affirms the arbitrator's finding that [claimant] is entitled to the prospective medical care of surgical releases recommended by Dr. Neumeister, who opined that [claimant] had failed conservative measures with splinting and this warranted decompression. Dr. Neumeister opined that the release surgeries are necessary. Dr. Rotman opined that they are not, based on his nerve studies. However, [claimant] testified that it was Dr. Rot-

man's nurse who performed those studies and that they were different than those performed by Dr. Trudeau. The Commission finds Dr. Trudeau's nerve conduction studies to be more credible than Dr. Rotman's."

With regard to Question 3, the Commission found:

"Dr. Neumeister did not indicate the sequence in which he would perform the release surgeries and was not asked his opinion of this. It was Dr. Rotman's opinion that symptoms of pronator tunnel are referred from the carpal tunnel and generally go away after an isolated carpal tunnel release."

With regard to Question 4, the Commission found:

"The [alternative procedures to surgery] are recommended by Dr. Rotman. Dr. Neumeister opined that [claimant] had failed conservative measures with splinting and this warranted decompression. The Commission finds that the course of treatment recommended by Dr. Neumeister to be reasonable and necessary."

With regard to Question 5, the Commission found:

"[Claimant] testified that when he [presented to] Dr. Neumeister for his finger injury in April and May 2004, he would inform him of what was going on with his upper extremities. [Claimant] stated that Dr. Neumeister would tell him that when his finger was healed, he wanted to do surgery on his upper extremities. [Claimant] testified that Dr. Neumeister did not recommend surgery the first time [claimant] saw him, but did say that surgery was a possibility. [Claimant] stated that Dr. Neumeister recommended surgery in May 2004. [Claimant] was not aware that Dr. Neumeister testified at his deposition that on April 1, 2004, he wrote a letter saying he wanted to do surgery on [claimant] and requested pre-authorization for the surgeries.

According to Dr. Neumeister's records, [claimant] was seen on April 1, 2004, for a finger injury. At that time, [claimant] also reported numbness and tingling in his digits on the radial side and ulnar side. Dr. Neumeister recommended treatment consisting of splinting and right hand only work. Dr. Neumeister saw [claimant] on April 19, 2004 *** . Dr. Neumeister noted that he would wait until [claimant's] finger healed and then talk to him about scheduling nerve compression release surgery. In a slip that date, Dr. Neumeister noted [claimant] was to continue light duty restrictions. On December 2, 2004, Dr. Neumeister noted that [claimant] was being seen for a finger evaluation. Dr. Neumeister noted that [claimant] was still waiting for a reply regarding the multiple nerve entrapments, including bilateral cubital tunnel, pronator and carpal tunnel. Dr. Neumeister opined that [claimant] had failed conservative measures, that his conditions warranted surgical releases and that he was awaiting a decision from the workers' compensation adjuster.

In his February 14, 2005, deposition, Dr. Neumeister testified that on April 19, 2004, he had noted that he would seek to schedule surgery. Dr. Neumeister testified that he recommended or considered recommending surgical release at that time because of the significant compression that Dr. Trudeau had found. Dr. Neumeister identified a letter he wrote To Whom It May Concern on April 1, 2004, and in that letter, he noted that he had recently assessed [claimant], who had multiple nerve entrapments, including bilateral cubital tunnel, pronators and carpal tunnel syndrome with ongoing symptoms on both sides. He noted that [claimant] wanted surgical decompression of these multiple nerve entrapments. Dr. Neumeister noted that he required pre-authorization for the proposed surgeries. He acknowledged that his office notes did not reflect discussing surgical decompression with [claimant] on April 1, 2004. Dr. Neumeister testified he sought approval for surgery at [claimant's] initial visit on April 1, 2004, because it often takes an extended period in order to get approval. The Commission finds Dr. Neumeister's testimony to be credible and not contradictory regarding when he sought approval to perform the proposed surgeries. The Commission recognizes that it does often take an extended period to get approval of a surgical procedure from an insurance carrier."

On January 25, 2008, the circuit court confirmed the Commission's August 14, 2007, decision. As noted, respondent was granted leave to file a late notice of appeal by this court on March 18, 2008.

## ANALYSIS

### 1. Whether the Commission Complied With the Requirements of Section 19(e) of the Act

On appeal, respondent first argues that the Commission, on remand from the circuit court, violated section 19(e) of the Act by not answering Questions 1, 2, and 3, propounded in respondent's statement of exceptions from the arbitrator's September 6, 2005, decision. Respondent does not argue that the Commission abdicated its statutory obligation in answering Questions 4 and 5. Although the Commission is required to make findings of fact and conclusions of law pursuant to section 19(e) of the Act (820 ILCS 305/19(e) (West 2002)), there is no requirement that any particular language be used. *J.S. Masonry, Inc. v. Industrial Comm'n*, 369 Ill. App. 3d 591, 598 (2006).

■ Section 19(e) of the Act states:

"In any case the Commission in its decision may find specially upon any question or questions of law or fact which shall be submitted in writing by either party whether ultimate or otherwise; provided that on issues other than nature and extent of the dis-

ability, if any, the Commission in its decision shall find specially upon any question or questions of law or fact, whether ultimate or otherwise, which are submitted in writing by either party; provided further that not more than 5 such questions may be submitted by either party." 820 ILCS 305/19(e) (West 2004).

Section 7040.40 of the Rules Governing Practice Before the Workers' Compensation Commission provides, in pertinent part:

"1) Either party may request in writing that the Commission make special findings upon written question or questions of law or fact (not to exceed five (5) in number) submitted to it concerning issues raised by the review. Said interrogatories shall be filed at least five (5) days prior to the Oral Argument or five (5) days after completion of the review hearing, whichever is later.

\*\*\*

3) A copy of the interrogatories must be served on the other side with appropriate proof of service." 50 Ill. Adm. Code §§7040.40(a), (c), amended at 14 Ill. Reg. 13173, eff. August 1, 1990.

Respondent complied with the requirements of the Act in submitting the five questions to the Commission. Claimant did not object to any of the questions.

■ With regard to Question 1, respondent argues that the Commission rendered an unresponsive answer. We disagree. As noted, Question 1 asked: "What job task did [claimant] perform in a repetitive manner?" In response to the question, the Commission found that claimant's work involved the use of handheld tools including screwdrivers, wrenches, socket drivers, wire cutters, pullers, channel locks, electric drills, hammer drills, a matavos grinding wheel, and pneumatically driven tools for five to eight hours a day in addition to requiring claimant to use his upper extremities to climb stairs, scaffolding and ladders. Further, the Commission directly answered respondent's question when it found: "While [claimant's] duties may not have been 'repetitive' in a sense that the same thing was done over and over again as on an assembly line, the Commission finds that his duties required an intensive use of his hands and arms and his injuries were certainly cumulative." As will be addressed later in section 2 of this Analysis, the Commission's finding that claimant suffered a work-related repetitive trauma injury was supported by the evidence.

Respondent then argues that the Commission's answer to Question 2 was also unresponsive. As noted, Question 2 asked: "W[ere] Dr. Neumeister's diagnos[es] of left cubital tunnel and bilateral pronator syndrome confirmed or contradicted by the physical examinations and electrodiagnostic testing of Drs. Trudeau and Rotman?" In response to this question, the Commission found: "Dr. Neumeister's diagnos[es]

of left cubital tunnel and bilateral pronator syndrome were based on his clinical examination." The Commission's answer is responsive. As is evident, Dr. Neumeister's diagnoses of left cubital tunnel and bilateral pronator syndrome were contradicted by the opinions of Dr. Trudeau and Dr. Rotman. The Commission's finding that Dr. Neumeister's diagnoses of left cubital tunnel and bilateral pronator syndrome were based on his clinical examination was an expression that the Commission found the diagnoses of Dr. Neumeister credible. As will be explained in greater detail below, it is the function of the Commission to judge the credibility of the witnesses and to resolve conflicts in medical testimony. *Caterpillar Tractor Co. v. Industrial Comm'n*, 124 Ill. App. 3d 650, 653 (1984).

Respondent then argues that the Commission's findings in response to Question 3 were unresponsive. As noted, Question 3 asked: "Is it reasonable to perform pronator syndrome surgery at the same time as carpal tunnel syndrome when the evidence at arbitration indicates that symptoms of pronator tunnel are referred from the carpal tunnel and generally go away after an isolated carpal tunnel release?" In response, the Commission found that Dr. Neumeister did not indicate and was not asked in what sequence he would perform the prospective surgeries. The Commission also pointed out that it was Dr. Rotman's opinion that the symptoms associated with pronator syndrome would dissipate with an isolated carpal tunnel release. As noted, the Commission found Dr. Neumeister's testimony, that claimant required pronator decompression, credible.

Although respondent argues that the Commission's findings with regard to Questions 4 and 5 were illogical, it does not argue that the Commission abdicated its statutory responsibilities in not answering them.

## 2. Whether the Commission's Finding That an Accident Occurred Which Arose Out of and in the Course of Claimant's Employment With Respondent Was Against the Manifest Weight of the Evidence

Respondent argues that the Commission's finding that an accident occurred which arose out of and in the course of claimant's employment with respondent was against the manifest weight of the evidence. Respondent argues that claimant failed to prove a compensable "repetitive trauma" injury.

Whether an injury arose out of and in the course of one's employment is a question of fact for the Commission to decide, and its determination will not be disturbed unless it is against the manifest weight of the evidence. *Certified Testing v. Industrial Comm'n*, 367 Ill. App. 3d 938, 944 (2006). A finding is against the manifest weight of

the evidence only if the opposite conclusion is clearly apparent. *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086 (2005).

An employee's injury is compensable under the Act only if it arises out of and in the course of his employment. 820 ILCS 305/2 (West 2004). "In the course of" employment refers to the time, place and circumstances under which the accident occurred. *Lee v. Industrial Comm'n*, 167 Ill. 2d 77, 81 (1995). "For an injury to 'arise out of' the employment its origin must be in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58 (1989). Additionally, an injury arises out of the employment if the claimant was exposed to a risk of harm beyond that to which the general public is exposed. *Brady v. L. Ruffolo & Sons Construction Co.*, 143 Ill. 2d 542, 548 (1991).

An employee who suffers a repetitive-trauma injury still may apply for benefits under the Act, but must meet the same standard of proof as an employee who suffers a sudden injury. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 65 (2006).

In the case at bar, there was sufficient evidence to support the Commission's finding that claimant's injuries arose out of and in the course of his employment with respondent. Claimant was employed as an electrician for the City since 1996. He was required to undergo a preemployment physical, which he passed. His work required him to maintain "everything related to controls, measurements, levels, emissions and computer equipment." His work required him to operate a variety of handheld tools, including wrenches, pliers, channel locks, screwdrivers, wire strippers, drills, a matavos grinding wheel and a saw-zaw. Claimant worked eight hours a day, five days a week, with varying degrees of overtime. Claimant testified that out of an eight-hour work day, at least five of those hours were spent using vibratory tools. Although he is right-hand dominant, claimant testified that he was ambidextrous with the use of tools and that he used both hands throughout the course of his work day. Claimant testified that his place of work, the Dahlman plant, vibrated constantly. Claimant also testified that his work required reaching with his upper extremities, including reaching to grab wire.

Gurnsey, a one-time co-worker of claimant, testified that claimant was required to use tools approximately six hours a day. Gurnsey also testified that as an electrician at the Dahlman plant, claimant was required to do a great deal of climbing, pushing, and pulling with his upper extremities, and that the work required twisting, turning, and grasping of the hands at the wrists and elbows. He testified that when operating a drill, claimant would sometimes have to push on the drill with great force as some of the steel in the Dahlman plant was thick.

Claimant testified that he began to experience difficulties with his upper extremities in March 2004. He felt severe pain in his right hand which radiated to his right elbow and also experienced pain in his left arm. Working with tools precipitated the onset of pain.

As noted, claimant first presented to Dr. Yu on March 17, 2004. After an examination, Dr. Yu referred claimant to Dr. Trudeau. Dr. Trudeau performed an EMG and diagnosed claimant with bilateral carpal tunnel syndrome and cubital tunnel syndrome of the left elbow.

As noted, claimant first presented to Dr. Neumeister with regard to his upper extremity ailments on April 1, 2004. After a series of physical examinations, Dr. Neumeister diagnosed claimant with bilateral cubital tunnel syndrome, bilateral carpal tunnel syndrome, and bilateral pronator syndrome. Dr. Neumeister testified that claimant's work involved twisting wires, using pliers, and also involved frequent and repetitive hand usage during his entire work shift.

Despite the foregoing, respondent argues that claimant failed to prove a repetitive trauma injury because the evidence in this case demonstrates that claimant's work was varied. Citing *Williams v. Industrial Comm'n*, 244 Ill. App. 3d 204 (1993), respondent argues that a finding of repetitive trauma is not warranted if an employee's work does not involve performing a single task in a repetitive fashion on a daily basis.

This court, in *Williams*, found that the Commission's finding that the claimant's work did not support a finding of a repetitive trauma injury was not against the manifest weight of the evidence because the evidence showed that the claimant did not perform the same task in a repetitive fashion on a daily basis. *Williams*, 244 Ill. App. 3d at 211. The claimant in *Williams* testified that he could perform a specific task one day and not perform the same task for months. *Williams*, 244 Ill. App. 3d at 211. Further, the claimant did not use any particular tool on a daily basis. *Williams*, 244 Ill. App. 3d at 211. Moreover, conflicting medical testimony was presented regarding whether the claimant had sustained a repetitive trauma injury, and the Commission found the medical testimony supporting the finding of the absence of a repetitive trauma injury more credible than the medical testimony supporting the finding of such an injury. *Williams*, 244 Ill. App. 3d at 211.

In the instant case, the evidence shows that although claimant's work varied, it was repetitive in nature. As the Commission noted, although the evidence shows that claimant's work was not repetitive in the sense that he worked on an assembly line and performed the same task over and over again, claimant's work was repetitive enough to support the finding that claimant suffered a repetitive trauma

injury that arose out of and in the course of his employment with respondent. Further, the medical evidence also supported the finding that claimant's work was repetitive in nature. In particular, Dr. Neumeister's testimony supports the finding that claimant's work was repetitive in nature and that his injuries arose out of and in the course of his employment with respondent. It is the function of the Commission to judge the credibility of witnesses and resolve conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980). This court cannot find that the Commission's finding that claimant suffered a repetitive trauma injury was against the manifest weight of the evidence because we cannot say that a contrary finding was clearly apparent from the evidence presented.

### 3. Whether the Commission's Finding That Claimant's Bilateral Carpal Tunnel, Bilateral Cubital Tunnel, and Bilateral Pronator Syndromes Were Causally Related to a Work-Related Accident Was Against the Manifest Weight of the Evidence

■ Respondent then argues that the Commission's finding that claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes were causally related to a work-related accident was against the manifest weight of the evidence. Whether a causal connection exists is a question of fact for the Commission, and a reviewing court will overturn the Commission's decision only if it is against the manifest weight of the evidence. *Navistar International Transportation Corp. v. Industrial Comm'n*, 331 Ill. App. 3d 405, 415 (2002). In resolving questions of fact, it is the function of the Commission to judge the credibility of the witnesses and resolve conflicting medical evidence. *O'Dette*, 79 Ill. 2d at 253. "In cases relying on the repetitive-trauma concept, the claimant generally relies on medical testimony establishing a causal connection between the work performed and claimant's disability." *Williams*, 244 Ill. App. 3d at 209. A factual finding by the Commission will not be set aside on review unless it is against the manifest weight of the evidence. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987). For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal. *University of Illinois v. Industrial Comm'n*, 365 Ill. App. 3d 906, 910 (2006). If there is sufficient factual evidence in the record to support the Commission's determination, it will not be set aside on appeal. *Beattie v. Industrial Comm'n*, 276 Ill. App. 3d 446, 450 (1995).

Here, the factual evidence presented at the September 6, 2005, arbitration hearing was sufficient to support the Commission's determination that claimant's bilateral carpal tunnel, bilateral cubital

tunnel, and bilateral pronator syndromes were causally related to claimant's work activities.

After physically examining claimant and performing an EMG of claimant's upper extremities, Dr. Trudeau diagnosed claimant with bilateral carpal tunnel syndrome and with right arm cubital tunnel syndrome. Dr. Trudeau opined that claimant's injuries were work-related. Dr. Trudeau noted that claimant's work involved performing fine motor activities with his hands, that he routinely twisted wire, used pliers, handled small objects, and performed frequent and repetitive hand usage throughout his work shifts.

After physical examination, Dr. Neumeister diagnosed claimant with bilateral cubital tunnel, bilateral carpal tunnel, and bilateral pronator syndromes. Dr. Neumeister opined that the vibration of claimant's upper extremities caused by the vibration of the Dahlman plant, and claimant's use of vibratory tools on a consistent basis, consistent activities of pushing and pulling with his upper extremities, consistent fine manipulation of physical objects with claimant's fingers, consistent grasping and twisting of wires, consistent use of pliers and other frequent and repetitive hand usage throughout his work shifts caused his physical ailments.

Dr. Rotman, who examined claimant pursuant to section 12 of the Act, did not render an opinion regarding causation. Based upon electrical studies performed on claimant's upper extremities, Dr. Rotman did opine that there was no evidence that claimant had any entrapment neuropathy. However, the Commission discounted Dr. Rotman's opinions because Dr. Rotman was not present during most of the examination which took place at his medical office, but rather, it was one of Dr. Rotman's nurses who performed the physical examination. The arbitrator and later the Commission, when adopting the findings of the arbitrator, believed Dr. Neumeister over Dr. Rotman. As noted, it is the function of the Commission to judge the credibility of the witnesses and resolve conflicting medical evidence, and it did that when it adopted the decision of the arbitrator. *O'Dette*, 79 Ill. 2d at 253.

Based upon the foregoing, we find that the record contains a sufficient evidentiary basis for the Commission's determination that claimant's upper extremity injuries were causally related to his employment with respondent.

4. Whether the Commission's Finding That Dr. Neumeister's Proposed Medical Treatment Consisting of Several Surgical Releases Pertaining to Claimant's Bilateral Carpal Tunnel, Bilateral Cubital Tunnel, and Bilateral Pronator Syndromes are Reasonable and Necessary, and the Commission's Award of the Prospective Surgeries Prescribed by Claimant's Treating Physician and "Related Medical Care" Based on That Finding is Against the Manifest Weight of the Evidence

■ Finally, respondent argues that the Commission's finding that Dr. Neumeister's proposed medical treatment, surgical releases pertaining to claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes are reasonable and necessary, and the Commission's award of prospective medical treatment based on that finding is against the manifest weight of the evidence.

Section 8(a) of the Act entitles a claimant to compensation for all necessary first aid, medical and surgical services and all necessary medical, surgical and hospital services "thereafter incurred" that are reasonably required to cure or relieve the effects of injury. 820 ILCS 305/8(a) (West 2004). Prescribed services not yet performed or paid for are considered to have been "incurred" within the meaning of the statute. *Certified Testing v. Industrial Comm'n*, 367 Ill. App. 3d 938, 948 (2006).

As noted, Dr. Neumeister prescribed surgical releases of claimant's nerve entrapments due to his bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes. Dr. Neumeister testified that the procedures were reasonable and necessary, and the Commission awarded claimant prospective medical benefits consisting of the several surgical procedures and other medical care incident thereto.

Respondent argues that there is a lack of proof that performing all six surgeries is necessary because Dr. Trudeau recommended several different conservative treatment options for claimant's ailments including physical therapy, warm packs, deep sedative massage, ultrasound, range of motion exercise, strengthening exercise, nerve intended grinding exercise, stretching, injections into the wrists or elbows, electronic nerve stimulation, and anti-inflammatory or analgesic medications. Respondent argues that awarding the prospective surgical releases was against the manifest weight of the evidence because Dr. Neumeister did not attempt treating claimant with conservative treatment before prescribing surgery.

It should be noted that Dr. Trudeau listed the aforementioned conservative treatment options alongside corrective surgical options for the ailments that he diagnosed claimant with, namely, bilateral carpal tunnel and right cubital tunnel syndromes. We also note that

Dr. Neumeister prescribed claimant conservative treatment for his upper extremity ailments on April 1, 2004, including treatment with the use of wrist splints. Claimant testified that his symptoms, including extreme pain, worsened with the use of the splints. On April 19, 2004, Dr. Neumeister noted that splinting had failed to alleviate claimant's upper extremity ailments and that he would recommend entrapped nerve surgical releases.

In the same vein, respondent argues that the Commission's finding that the surgical releases for claimant's pronator syndrome were necessary was against the manifest weight of the evidence. Respondent argues that surgical releases of claimant's bilateral pronator syndrome are unnecessary because the evidence in this case indicates that the symptoms related to pronator syndrome are often caused by carpal tunnel and will often alleviate after a surgical correction of carpal tunnel syndrome. In essence, respondent argues that the Commission awarded claimant unnecessary surgical procedures. Further, respondent argues that Dr. Neumeister's credibility should be questioned by this court because Dr. Neumeister sought approval for the prospective surgeries even before having discussed surgical options with claimant.

Dr. Neumeister conducted several physical examinations of claimant and diagnosed claimant with bilateral cubital tunnel, bilateral carpal tunnel, and bilateral pronator syndromes. On April 1, 2004, Dr. Neumeister noted that he prescribed claimant conservative treatment consisting of splinting of claimant's wrists. On April 19, 2004, Dr. Neumeister noted that conservative treatment of claimant's ailments had failed and that he recommended six entrapped nerve surgical releases for the conditions ailing claimant. Dr. Rotman noted that symptoms related to pronator syndrome are often caused by carpal tunnel and will often alleviate after a surgical correction of carpal tunnel syndrome. The Commission noted that Dr. Neumeister was not asked and did not state in what order he proposed to perform the prescribed surgeries for claimant's bilateral carpal tunnel, bilateral cubital tunnel, and bilateral pronator syndromes. Dr. Neumeister did however testify that all six of the surgical releases that he prescribed were reasonable and necessary.

Again, it is the function of the Commission to resolve conflicting testimony and resolve conflicting medical evidence. *O'Dette*, 79 Ill. 2d at 253. As noted, the Commission believed Dr. Neumeister's testimony that the prospective surgical releases were reasonable and necessary to alleviate claimant's symptoms and did not believe Dr. Rotman's testimony. Furthermore, with regard to the fact that Dr. Neumeister sought approval for the surgeries before discussing surgical options with claimant, Dr. Neumeister testified that he sought early approval

because approval often takes a long period of time. The Commission believed Dr. Neumeister's testimony in that regard and found his testimony credible. It is not for this court to second-guess that finding. We therefore find that the Commission finding that the surgical releases pertaining to claimant's ailments were reasonable and necessary and not against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court of Sangamon County, which confirmed the Commission's August 14, 2007, decision.

Affirmed.

McCULLOUGH, P.J., and HUDSON, HOLDRIDGE, and DONOVAN, JJ., concur.