2015 IL App (1st) 141057WC

FILED: October 2, 2015

NO. 1-14-1057WC

IN THE APPELLATE COURT

OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| S&C ELECTRIC COMPANY, | ) | Appeal from |
| Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | No. 13L50711 |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.* (Edmundo Cortez, | ) | |
| Appellees). | ) | Honorable |
| | ) | Robert Lopez-Cepero, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Stewart
concurred in the judgment and opinion.

**OPINION**

¶ 1        On March 16, 2011, claimant, Edmundo Cortez, filed an application for

adjustment of claim pursuant to the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1

to 30 (West 2002)), seeking benefits from the employer S&C Electric Company in case No.

11WC10211.  He alleged he suffered injuries to his lumbar spine while lifting and pulling

equipment at work on February 4, 2011.  On April 5, 2012, claimant filed a second application

for adjustment of claim alleging injury to his "back man as a whole" resulting from lifting,

bending, and pulling in the performance of his employment on February 15, 2011, in case No.

12WC12147.  Following a September 11, 2012, consolidated hearing, the arbitrator concluded in

case No. 11WC1021 claimant had established an accident that occurred on February 4, 2011, that arose out of and in the course of his employment, and his current condition of ill-being in his low back was causally related to the work accident. The arbitrator calculated claimant's average weekly wage as $572.43 and awarded claimant total disability benefits of $381.62 per week for the period of February 15, 2011, through September 11, 2012.

¶ 2        On review, the Illinois Workers' Compensation Commission (Commission) affirmed and adopted the arbitrator's decision. The Commission also remanded the matter to the arbitrator for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 399 N.E.2d 1322 (1980). On judicial review, the circuit court of Cook County affirmed the Commission's decision. On appeal, the employer argues the Commission's (1) finding claimant sustained a compensable work-related injury was against the manifest weight of the evidence and (2) decision improperly included overtime hours in the calculation of claimant's average weekly wage. We affirm and remand the matter for further proceedings.

¶ 3                        I. BACKGROUND

¶ 4        The following evidence relevant to this appeal was elicited at the September 11, 2012, arbitration hearing.

¶ 5        Claimant began working for the employer in August 2010 as a "mechanical assembler basic." Claimant testified that he worked 10 hours per shift, 5 days per week, which included mandatory overtime. His job duties included assembling an average of three to four stainless steel tanks each shift. Claimant testified his job required him to lift cables weighing 10 to 50 pounds and tools weighing 25 to 30 pounds. He installed one to two wire cables per tank, tightening the bolts with a wrench-like tool that was at least one meter long and made of thick metal. To tighten the bolts, claimant explained, "we have to insert [the wrench] to the nut almost

to the eye level.  Then we pull it down, all the way down to the floor, pull it taut and put it back on the top again.  Again, pull it down, bend it over all the way down to the floor until the nut is securely tightened."  According to claimant, this step is repeated 30 to 40 times before the bolt is tight.  He then had to lean over the tank and connect the wires.  Claimant testified that, as a new employee, he was not allowed to sit down while assembling the tanks.

¶ 6        Claimant testified that at approximately 10 p.m. on the night of the accident, he was using a manual hand jack with a steel extension to pick up a pallet.  Claimant explained "[t]he steel extension [located on] the top of the hand jack is one-inch thick with almost like one meter square on the top of the forklift."  Claimant testified he had to pull the steel extension on the hand jack up in order to slide the jack under the pallet.  In order to do this, claimant stated, "I stood in front of the hand jack.  I bent at my waist.  I pulled up the extension bars on the top of it."  According to claimant, "[t]hat is the time I felt the click on my back."  Claimant continued to pull up on the extension bar to lock it in place and then grabbed his back which was "painful already."  He described the location of the pain as "the left side of the lower back."  Claimant testified that one of his coworkers asked if he was okay.  He replied, "I just have a click in my back."  Claimant explained although his back was already painful, he could still do his job and so he continued to work.  The accident occurred on a Friday, and over the weekend, claimant took Advil, used a hot pack on his back, and lay on his couch.  On cross-examination, claimant acknowledged he worked the Saturday following the accident—as evidenced by his time card—but testified the pain he experienced directly following the accident was "just like an ordinary pain."

¶ 7        Claimant testified that his back was still painful when he returned to work the following Monday, and noticed the pain increased when he bent over, pulled something, or

tightened bolts. He continued to work the rest of the week despite the increasing pain. By Wednesday, claimant stated he had started to notice pain running through his left leg. The following weekend, he took Aleve and used hot packs on his back.

¶ 8    According to claimant, when he returned to work on Monday, February 14, 2011, he spoke to his team leader, Robert Navarro, to inform him that he might see claimant sitting down at his work station due to back pain. Claimant did not want Navarro to think he was lazy. Claimant noted as of that Monday, his pain was "worse already, because it [was] running, really going to my left leg. It [was] almost really difficult for me to walk."

¶ 9    Claimant testified that the following morning, February 15, 2011, Navarro approached him and asked how his back was. Claimant stated he told Navarro it was "worse, very painful." According to claimant, Navarro then told him to inform their supervisor, Jim Wilson, and then go see the nurse. Claimant testified when he told Wilson he was going to see the nurse, Wilson responded, in what claimant perceived to be a threatening manner, "that is not work-related." Claimant stated that Wilson's comment scared him as he was still in his probationary period at work.

¶ 10    James Wilson testified that he was a supervisor for the employer on the date of the accident. Wilson testified claimant, as well as other employees, were allowed to leave early from their shifts on February 1, 2011, due to a snow storm. Claimant did not work the following day. According to Wilson, when claimant returned to work February 3, claimant showed him a picture of the snow in the alley by his apartment and told him "he had to shovel the snow to get out to the street." Claimant admitted to having shown Wilson a photograph of the snow, but he denied telling Wilson he had to shovel the snow and testified he did not own a shovel at that time.

¶ 11 Wilson testified that employees are required to report all work injuries immediately to someone in leadership. According to Wilson, when an employee reports an accident to him, he immediately sends them to see the nurse. Wilson stated claimant did not report an accident to him until February 15, 2011, at which time he sent claimant to see the nurse. Wilson further testified claimant denied injuring himself at work when he and Navarro asked, but he stated that claimant later attributed his injury to work because another employee had experienced the same symptoms. According to Wilson, however, the other employee's symptoms resulted from a tripping incident. Wilson denied telling claimant the injury "[was] not work-related" and testified he had never threatened an employee for filing a workers' compensation claim.

¶ 12 On cross-examination, Wilson testified that prior to February 2011, claimant performed "at a very good level" and was able to perform all his job duties.

¶ 13 Robert Navarro testified that he worked for the employer in a leadership position. He stated that all injuries, no matter how minor, were required to be reported immediately to someone in leadership. Navarro testified the employees were aware of this rule. During his testimony, claimant denied having any knowledge of this rule.

¶ 14 According to Navarro, on February 15, 2011, he noticed claimant "making gestures on his face like he was hurting, like injured or something." He asked claimant if something was wrong and claimant responded that his back and legs were hurting and that he could not stand up for long. Navarro testified claimant told him "he used to get that pain when he used to work at a liquor store. The pain used to go off and on." During his testimony, claimant denied injuring his back while working at a liquor store. Navarro stated that as soon as he became aware of claimant's back pain, he "persuaded" claimant to go see the nurse. Navarro

denied having a conversation with claimant the day before regarding his back pain. According to Navarro, claimant told him that he was not sure whether he had injured himself at work but noted another employee had a similar injury.

¶ 15        Koffi Kongo, claimant's co-worker, signed an affidavit on May 16, 2011, indicating that on or about February 4, 2011, he was working near claimant when he "saw him injure his back in the course of his employment." Kongo further noted, "[a]fter witnessing [claimant] grab for his lower back in obvious pain[,] I asked if he was alright and he told me[, ']I felt a pop in my lower back.' " Kongo testified at his deposition that claimant did not appear to have any back problems prior to the work accident. He was unable to recall the particular date of the accident but stated it was in February.

¶ 16        Janice McLeran, the employer's health services administrator, testified regarding a February 15, 2011, nurse's note that indicated claimant reported "having a bad pain that is hard to tolerate in certain positions" that "originates in low back" and "goes all the way down left leg to calf along the back of the leg" which began approximately three weeks prior to the visit. The note further stated, "RN attempted to discuss causation and he states day shift [employee] had same symptoms so he feels this must be [related to] the job. He does not have a special moment in time. He denies prior medical history of this." According to McLeran, she was present in the room with claimant and the nurse when claimant "told us he was sure [the injury] was work-related because somebody else in his department had the same symptoms." McLeran testified she did not seek further information from claimant regarding a specific time or date of his injury. She stated she had worked closely with claimant on short-term disability and had no recollection of claimant telling her he was injured at work while using a hand jack. During his testimony, claimant stated he told the nurse he did not know what caused his back pain because he was

"scared of [Wilson] and my job.  I might lose my job."

¶ 17        After seeing the company nurse on February 15, 2011, claimant was referred to Peterson Urgent Care Center where he reported having pain in his left hip down into his left leg for the last two weeks.  He was diagnosed with acute lumbar pain and a possible herniated disc.  He returned to Peterson Urgent Care Center the following day and reported his pain was "worsening day by day." The medical report from the latter visit indicated claimant had experienced "mild pain when pulling something at work."

¶ 18        On February 17, 2011, claimant first saw Dr. Sara Brown, a family and sports medicine physician.  At that time, claimant reported experiencing severe low back pain shooting down his left leg stopping at the mid-calf for approximately three weeks.  When Dr. Brown asked claimant whether he had suffered a trauma or injury, he initially responded, "no"; however, she stated claimant immediately followed up by saying, "I think this happened at work."  He told her he did a lot of walking, bending, and pushing at work.  She diagnosed claimant with "lubago," or low back pain, which she believed was likely due to a disk herniation.  Dr. Brown ordered a magnetic resonance image (MRI) of claimant's back, prescribed steroids, ordered physical therapy, and restricted him from lifting, pushing, or pulling at work.

¶ 19        Dr. Brown next saw claimant on March 1, 2011.  At that time, claimant continued to complain of low back pain that was worsening, a sharp shooting pain down his left leg, and numbness in his left leg.  She reviewed the results of his MRI, which indicated "a very severe disk herniation at the L5-S1 level with impingement on the S1 nerve root."  Dr. Brown testified the MRI results were consistent with claimant's pain complaints.  She explained that the MRI also indicated some degenerative changes, but noted the severe extrusion of the disk was more indicative of a traumatic change.  Dr. Brown referred claimant to Dr. David Walega, an

interventional spine specialist, for further treatment.  She opined that claimant's disk herniation was caused by a work injury based on the information he had provided.

¶ 20    On cross-examination, Dr. Brown denied that claimant related his injury to work based on a co-worker's report of similar symptoms.  She agreed that she had no knowledge of the bending, pushing, and lifting requirements of claimant's job, and acknowledged claimant did not specifically attribute his injury to any of these activities.  She agreed a person could suffer a herniated disk from shoveling snow.

¶ 21    Claimant saw Dr. Walega on March 8, 2011, and received an epidural steroid injection that provided relief for two days.  Thereafter, Dr. Walega referred claimant to Dr. Joshua Rosenow, a neurosurgeon.

¶ 22    On March 18, 2011, claimant saw Dr. Rosenow.  According to an April 6, 2011, letter from Dr. Rosenow to Dr. Walega, claimant "[l]ifted something very heavy (hand jack extension of at least 50 lbs) at work in February and felt a 'click' in his back with new onset of LLE radicular pain increasing over several days."  Due to claimant's failure to obtain relief through conservative treatment, Dr. Rosenow recommended a surgical decompression.  On March 21, 2011, Dr. Rosenow performed a left L5-S1 laminectomy and microdiskectomy for what he described as a "very large herniated disk."  Following this surgery, claimant continued to complain of lumbar and buttock pain as well as severe headaches.  A May 4, 2011, MRI demonstrated a cerebrospinal fluid leak and on May 6, 2011, claimant underwent a second surgical procedure to repair the cerebrospinal fluid leak and dural tear, insert a spinal fluid drain, and remove a recurrent herniated lumbar disk. Thereafter, claimant began physical therapy.

¶ 23    On August 4, 2011, claimant saw Dr. Michel Malek, a neurosurgeon.  According to Dr. Malek's evidence deposition, claimant was referred to him by Diversey Medical Center,

but the record contains no indication of the reason claimant was seen at Diversey Medical Center. According to Dr. Malek's records, claimant was still experiencing pain in his back that radiated down his lower left leg. Dr. Malek ordered a repeat MRI scan of claimant's lumbar spine. The results of the MRI indicated "post-operative changes at L5-S1, retrolistheses of L5 on S1 with no evidence of recurrent disc herniation, primarily scarring *** [and] a small annular tear at L4-5 and no significant foraminal narrowing." Dr. Malek recommended a lumbar fusion at L5-S1. In Dr. Malek's opinion, short of proceeding with the lumbar fusion, claimant suffered from a permanent disability and had reached MMI.

¶ 24        Dr. Malek further opined that claimant's current condition of ill-being in his low back and his need for a lumbar fusion were the direct result of the February 4, 2011, work injury. He noted that although claimant suffered from an underlying degenerative condition, the degenerative condition was asymptomatic and unlikely to become symptomatic during claimant's lifetime absent the February 4, 2011, injury. (We note that a portion of Dr. Malek's deposition, specifically the portion in which he identified medical records he reviewed during his treatment of claimant, is missing from the record.)

¶ 25        On August 8, 2011, claimant saw Dr. Morris Marc Soriano, a neurosurgeon, for an independent medical evaluation. In addition to conducting a physical examination, Dr. Soriano reviewed the initial investigation report, the Peterson Urgent Care records, the MRIs, the operative reports, and the records of claimant's treating physicians. Dr. Soriano testified that claimant still complained of pain with prolonged sitting or standing and intermittent left leg pain. Following his physical examination of claimant, Dr. Soriano was of the opinion that claimant was in the process of recovering from his disk herniation. However, Dr. Soriano opined that the herniated disk and the corresponding surgery were not related to the February 4, 2011, accident.

When asked what he based his causation opinion on, the following colloquy occurred:

"A. Well, what was in [the incident investigation report] was that [claimant] was actually directly asked by the team leader if he had been injured at work, and he replied that he had not been injured at work. So, that was part of the reason I formulated my opinion that this was not a work injury, since [claimant] himself was not of the opinion, at least [as] of [February, 15, 2011], that he was injured at work.

Q. Did you see anything in the initial records that related any of his complaints to lifting, pushing or pulling at work?

A. No.

Q. What, if any, significance did you attach to that?

A. Well, when he tells—when he gives the direct report to the nurse that he had not lifted, pushed or pulled anything that would account for his pain, then I mean again that's information that you utilize to try and formulate an opinion, determine whether it's a work[-]related injury or not."

Dr. Soriano concluded that claimant would likely be able to return to work without restrictions following another two to four weeks of work hardening.

¶ 26    On October 26, 2012, the arbitrator issued her decision in the matter, finding claimant had established a February 4, 2011, accident, that arose out of and in the course of his employment and his current condition of ill-being in his low back was causally related to the work accident. The arbitrator specifically noted, "[i]n finding accident on [February 4, 2011],

the [a]rbitrator places greater weight on the credible testimony of [c]laimant and his co-worker and on the work accident reference recorded by Peterson Clinic and Dr. Brown than on the testimony of Mr. Wilson, Mr. Navarro and the nurse." She further noted, "the record is devoid of any credible evidence to suggest that [claimant] suffered any back problems prior to this accident." The arbitrator calculated claimant's average weekly wage as $572.43 and awarded claimant total disability benefits of $381.62 per week for the period of February 15, 2011, through September 11, 2012. On review, the Commission affirmed and adopted the arbitrator's decision. On judicial review, the circuit court of Cook County affirmed the Commission's decision.

¶ 27        This appeal followed.

¶ 28                          II.  ANALYSIS

¶ 29        On appeal, the employer argues the Commission's (1) finding claimant sustained a compensable work-related injury was against the manifest weight of the evidence and (2) decision improperly included overtime hours in the calculation of claimant's average weekly wage.

¶ 30        As a preliminary matter, we note that when it reviews the Commission's decision pursuant to the manifest-weight-of-the evidence standard, the circuit court must examine the evidentiary record. In this case, the circuit court found the Commission's decision was not against the manifest weight of the evidence and entered its order confirming the decision on March 13, 2014. However, two months later, on July 15, 2014, the court ordered the Commission to prepare and file the administrative-review record, which included the evidentiary record, with the circuit clerk. Thus, it does not appear the circuit court examined the record before it made its decision. However, since on appeal, we review the Commission's decision and

not the circuit court's judgment, we will consider the merits of this appeal. See *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 543, 950 N.E.2d 256, 260 (2010).

¶ 31                                       A. Compensable Injury

¶ 32        On appeal, the employer first argues the Commission's finding claimant sustained a compensable work-related injury on February 4, 2011, is against the manifest weight of the evidence. The employer's assertion is based on its contentions that (1) claimant and Kongo were not credible, and (2) claimant's theory of the injury was not supported by the contemporaneous medical histories he provided to his treating physicians.

¶ 33        "To obtain compensation under the Act, a claimant bears the burden of showing, by a preponderance of the evidence, that he has suffered a disabling injury which arose out of and in the course of his employment." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 671 (2003). An injury generally arises "in the course of employment" when it occurs "within the time and space boundaries of the employment." *Id*. Further, an injury "arises out of" employment when "the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Id*. at 203, 797 N.E.2d at 672.

¶ 34        "The determination of whether an injury arose out of and in the course of a claimant's employment is a question of fact for the Commission to resolve, and its finding in that regard will not be set aside on review unless it is against the manifest weight of the evidence." *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 24, 990 N.E.2d 284. "In resolving questions of fact, it is the function of the Commission to judge the credibility of witnesses and resolve conflicting medical evidence." *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315, 901

N.E.2d 1066, 1081 (2009). "For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent." *Springfield Urban League*, 2013 IL App (4th) 120219WC, ¶ 24, 990 N.E.2d 284.

¶ 35 The employer asserts that Kongo's testimony was not credible in that he (1) contradicted claimant regarding whether claimant solicited his testimony and (2) could not recall the specific date or time of the incident or the specific activity claimant was performing at the time of his injury. Although, as the employer notes, Kongo could not recall the specific date or time of the incident, he testified that he observed claimant "using the hand[]jack, like pulling the skid" and then reaching back with his left hand and grabbing his lower back in February of 2011. We decline to find that Kongo's inability to recall the specific date or time of the accident renders his testimony incredible. The employer also points to a discrepancy between Kongo's testimony that he thought claimant called him on the telephone to ask him to testify, and claimant's testimony that the two of them saw each other in a department store and Kongo offered to testify on claimant's behalf. To the extent an inconsistency exists in the witnesses' testimony in this regard, we find it is immaterial and does not undermine the arbitrator's credibility determination.

¶ 36 The employer next provides a bulleted list of "facts" in its brief which it claims demonstrates claimant's allegations of a work injury are not supported by the record. Many of these "facts" are simply portions of claimant's testimony which were contradicted by his supervisor or team leader. For example, the employer notes claimant's testimony (1) denying having told Navarro that he suffered intermittent back pain while working at the liquor store when Navarro testified claimant told him this; (2) that he told Navarro of his back pain the day before seeing the nurse, and Navarro's denial of any such conversation; and (3) that he felt threatened by Wilson's statement regarding the injury not being work related, and Wilson's

denial of having made such a statement.  In addition, the employer argues claimant's credibility was further undermined by his denial that he shoveled snow on February 2, 2011, when Wilson testified claimant told him he had shoveled snow.  This argument by the employer amounts to nothing more than an invitation to reweigh the evidence and find the employer's witnesses more credible then claimant's.  However, as noted above, it was for the Commission to weigh the evidence and resolve any conflicts in the testimony.  Here, the Commission, having heard the testimony of each witness, specifically found claimant's and Kongo's testimony more credible.  Based on this evidence, we find that the Commission's credibility determination was not against the manifest weight of the evidence.

¶ 37        The employer next takes issue with claimant's failure to initially provide details of the accident to his treating physicians, instead attributing his injury to work only because a co-worker had suffered similar symptoms.  According to the employer, claimant provided the specific details of his alleged injury only after he was confronted with the lack of documentation supporting a work injury.

¶ 38        Our review of the record reveals that on February 15, 2011, claimant reported to the company nurse that the pain in his low back and left leg began three weeks prior to his visit.  While claimant did not identify a specific event as having caused the injury at that time, he denied any prior medical history of low back pain and attributed his injury to work.  Although claimant told the nurse he thought his injury must be work-related because a coworker was experiencing similar symptoms, he testified that directly prior to seeing the nurse, he spoke with Wilson who told claimant the injury was "not work related."  We further note that McLeran, who was in the room with claimant and the nurse, testified she did not ask claimant for specific information regarding his injury.  Immediately after seeing the company nurse, claimant was

seen at Peterson Urgent Care, where claimant complained of pain in his left hip and left leg for the last two weeks. The next day, February 16, 2011, claimant again reported to Peterson Urgent Care, and the medical report from the later visit indicates claimant experienced "mild pain when pulling something at work." Further, on March 18, 2011, claimant reported to Dr. Rosenow that he was lifting an extension on a hand jack when he felt a click in his back followed by low back pain that increased over several days. Thus, contrary to the employer's contention, the medical records do provide details of a work injury suffered by claimant on February 4, 2011.

¶ 39    In addition, we note that Dr. Malek concluded claimant's injury was the direct result of the February 4, 2011, work injury. The sole medical opinion disputing causation in this case was Dr. Soriano's. He testified his finding of no causation was based on (1) the incident investigation report that noted claimant denied having injured himself at work when asked by Navarro and (2) his interpretation of the nurse's report as claimant having told the nurse he had not lifted, pushed or pulled anything that would account for his pain. We note, however, that the Commission specifically found the testimony of claimant and his co-worker more credible than the testimony of Navarro. In addition, the nurse's report referred to by Dr. Soriano did not contradict claimant's description of the mechanism of the injury, but stated only, "[h]e does not have a specific moment in time."

¶ 40    Based on the above evidence, we find the Commission's determination that claimant sustained a compensable work-related injury on February 4, 2011, was not against the manifest weight of the evidence.

¶ 41    B. Propriety of Including Overtime Hours in the Calculation of Claimant's Wage

¶ 42    Last, the employer argues the Commission improperly included overtime hours in its calculation of claimant's average weekly wage. Claimant asserts his overtime hours were

properly included in the calculation of his wage.

¶ 43    "In a workers' compensation case, the claimant has the burden of establishing his or her average weekly wage." *Kawa v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 120469WC, ¶ 134, 991 N.E.2d 430.  "The determination of an employee's average weekly wage is a question of fact for the Commission, which will not be disturbed on review unless it is against the manifest weight of the evidence." *Id*.  Although overtime wages are generally excluded from the calculation of an employee's compensation, an exception exists where the overtime hours are consistent and required by the employer.  820 ILCS 305/10 (West 2010); *Airborne Express v. Illinois Workers' Compensation Comm'n*, 372 Ill. App. 3d 549, 554, 865 N.E.2d 979, 983 (2007).

¶ 44    Despite the contentions of both the employer and claimant, neither the arbitrator nor the Commission included overtime hours in the calculation of claimant's average weekly wage.  In fact, the arbitrator's decision, which was adopted and affirmed by the Commission, states, "[i]n calculating the average weekly wage, the [a]rbitrator finds that [claimant] *failed to prove that overtime should be included in the calculation*."  (Emphasis added.)  The arbitrator noted, "the record is devoid of ample evidence to conclude that any time worked over 8 hours is mandatory."  Accordingly, the arbitrator subtracted claimant's overtime earnings of $1,127.23 from his gross wage of $15,438.25 and divided that amount ($14,310.93) by the number of weeks he worked (25) to obtain his average weekly wage of $572.43.  As such, we find this claim lacks merit.

¶ 45    III. CONCLUSION

¶ 46    For the reasons stated, we affirm the circuit court's judgment confirming the Commission's decision and remand for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327,

399 N.E.2d 1322.

¶ 47          Affirmed and remanded.